Filed 1/28/25  In re T.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E084032 |
| Plaintiff and Respondent, | (Super.Ct.No. DLIN2200016) |
| v. | OPINION |
| T.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Emily A. Benjamini, Judge.  Affirmed.

Shelia Oconnor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

1

In a wardship petition, the People alleged that, just short of his 18th birthday, T.R. (minor) shot and killed two minor victims during an armed robbery. The People alleged two counts of special circumstance first degree murder and moved the juvenile court to transfer minor to adult criminal court pursuant to Welfare and Institutions Code[1] section 707. Minor appeals from the order granting the motion and argues substantial evidence does not support the transfer. He contends, primarily, the juvenile court failed to properly consider and give sufficient weight to evidence of his childhood trauma and to science about adolescent brain development. We affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

A. *Alleged Offenses.*

At the time of the alleged offenses (July 20, 2022), minor was a few months shy of his 18th birthday (approximately 17 years eight months old). The two juvenile victims (a boyfriend and girlfriend) sold marijuana vape pens, and minor and his co-participant (a cousin) used a fake Instagram account to set up a meeting with the victims to purportedly purchase marijuana. Minor intended to rob the victims and directed them to his chosen meeting place.

Riverside County Sheriff's deputies responded to reports of a shooting and found a 16-year-old male victim dead in the passenger seat of a vehicle. A 17-year-old female juvenile victim, who was in the driver's seat, was barely conscious and died at the scene.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

Deputies observed several bullet strikes on the passenger side and trunk of the vehicle. They also found 15 cartridge cases on the scene that were later determined to have been fired from the same handgun.

A witness who was driving by reported he saw two males dressed all in black approach the vehicle from behind. One of the males, who was holding a handgun with a green laser attached to it, then walked to the passenger side of the vehicle. At first the witness thought the two males were just messing around and he did not take it seriously. But when he drove back to the area, the witness saw the female driver of the vehicle had blood coming out of her mouth and the vehicle was still in drive. Witnesses at the scene told the police they saw two male suspects run toward a nearby apartment complex, and other witnesses discovered a sweatshirt and BB gun inside a dumpster at the complex.

Surveillance video that captured the shooting showed two male subjects wearing black hooded sweatshirts walking toward the rear of the vehicle. One suspect approached the front passenger side door and pulled a handgun from his waistband. While pointing the handgun at the vehicle, the suspect tried to open the door but was unable to do so. He could be heard on the video saying, "don't run, don't run, don't run. Open it. Don't run. Don't Run!" As the vehicle started to drive away, he chased the vehicle and fired at the passenger side of the vehicle. The other suspect is shown standing at the driver's door, and he moved away as the vehicle began to drive away.

In July 2022—before minor was connected to the murders—the People filed a petition in the juvenile court alleging minor, when he was 16 years old, committed a

battery and inflicted serious bodily injury. (Pen. Code, § 243, subd. (d).) Appellant later admitted he committed an assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)), and the juvenile court declared him to be a ward and placed him on probation.

In February 2023, minor, who was then 18 years old, was arrested for possessing a dirk or dagger. (Pen. Code, § 21310.) While in custody, appellant was arrested and booked for the murders. The People filed a subsequent petition in the juvenile court, alleging two counts of special circumstance first degree murder. (Pen. Code, §§ 187, subd. (a), 190.2, subds. (a)(3) [multiple murders special circumstance], (a)(15) [lying in wait special circumstance], (a)(17)(A) [robbery-homicide special circumstance], (a)(22) [gang special circumstance].) The People also moved to transfer minor to adult criminal court pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).

B. *Psychological Evaluations.*

Dr. Adrianne Nelson conducted a court-ordered psychological evaluation of minor. In preparation, Dr. Nelson interviewed minor twice and reviewed various records. She reported minor did not present as very self-aware or self-reflective. Although minor was relatively forthcoming during the interviews, he expressed discomfort talking about his gang affiliation and avoided emotionally sensitive topics.

Minor described "several adverse childhood experiences." Minor spent his early childhood living with his mother in poverty, and they were evicted many times for failure to pay rent. He witnessed domestic violence in his mother's home, and he moved in with

4

his father during his sixth-grade year because his mother was a drug addict. Minor had little contact with his mother after that and believed she did not love him, but more recently he resumed contact with her.

Because his family had been evicted several times and he changed schools often, minor had little interest in school and, after moving in with his father, minor started ditching school in the sixth grade. According to school records, between 2010 and 2021 minor "engaged in several problematic behaviors in school that required a range of interventions from counseling to suspensions." His behavior worsened in 2019 and 2020, and minor was involved in at least four fights "that he likely instigated," one of which resulted in his expulsion. Minor's father disciplined him by taking away his cellular phone or video games. He was eventually expelled from school during the 10th grade, and he completed homework during his 11th and 12th grade years at home. Minor had not yet completed his GED, and he told Dr. Nelson he was not permitted to take classes while in jail.

With respect to mental health history, minor reported feelings of sadness but said he no major mental health problems. Minor said he felt sad when his mother used drugs or had no money to provide for him. He received individual anger management therapy from the Latino Commission to address school fighting. Minor admitted to abusing substances from a young age. He used alcohol, marijuana, and prescription pills (Xanax and Percocet). In the fourth or fifth grade, minor started drinking beer that was available to him in his mother's home. Minor first smoked marijuana in middle school, and he told

5

Dr. Nelson he still smoked marijuana vape pens daily and considered it a habit. He started taking Xanax in ninth grade and took about six pills a day. Minor naïvely said he believed he would refrain from using drugs and alcohol if he were released into the community. He had no history of substance abuse treatment.

Dr. Nelson observed a tattoo of a cross and a teardrop on minor's face. Minor admitted he joined the Avenue 52 criminal street gang, a subset of VCR (Vario Coachella Rifa), when he was 13 years old. He thought gangs were "cool" but he had not considered the long-term consequences of gang life. Minor hid his gang membership from his parents and siblings—if his parents asked him about things in his possession, why he was out late, or about the tattoos on his face, he changed the subject. Dr. Nelson noted "delinquent peers can increase a youth's risk for delinquency and violence. Presently, it is unclear if [minor] would choose to detach from his gang." She also noted minor might be more inclined to separate from the gang "if he was legally required to do so," but it was hard to gauge minor's commitment to the gang because he was guarded about the subject.

Minor admitted he started carrying a knife and a gun while in middle school, around the time he joined the gang. When asked why he posted pictures of himself on social media holding guns, minor answered, "everybody else did it." Minor said he started stealing from rival gang members around this same time. He was more likely to steal when under the influence of drugs, and he sometimes flashed his gun during robberies "to gain compliance from his rivals." Minor also admitted to selling drugs.

6

Dr. Nelson opined minor knew his actions were wrong and understood the risks involved in carrying a weapon, but he did not consider the consequences of his actions because his peers were doing the same thing. Minor specifically said he targeted rival gang members for robberies "who were unlikely to contact police if their belongings were stolen." Dr. Nelson reported she believed minor was engaging in more self-reflection "now that he is of sober mind[,] and he is in a position in which he must consider his current life circumstances."

Minor told Dr. Nelson his only contact with the juvenile court system occurred when he was expelled from school for assaulting another student, for which he was placed on probation. Minor reported he attended his appointments with his probation officer, but he tested positive for drugs on a couple occasions.

During her evaluation of minor, Dr. Nelson administered two personality tests, a test to measure anger intensity and expression, and a comprehension test to measure academic qualifications. She administered the adolescent versions of those tests because minor had not completed high school, he did not have a job, he had never lived independently, and he had no adult responsibilities.

The Millon Adolescent Clinical Inventory-II (MAC-II) profile showed minor's drug and alcohol use allowed him to release impulses without feeling responsible for his actions. Dr. Nelson noted a "mild depressive state" in minor, and "[g]rowing feelings of worthlessness and guilt" because of his situation. Minor reported "challenging social conventions, defying normative rules and expectations, and engaging in rebellious or

potentially illegal activities." Dr. Nelson observed minor came across "as a proper and respectful individual, who would be unlikely to engage in significant delinquent behaviors," but his admitted criminal history "suggests differently." She noted "one must consider how much [minor's] substance use, gang involvement, and peer pressure played a role in encouraging some of his behaviors."

Dr. Nelson described minor as "inflexible if not stubborn" about following conventional or formal modes of organizing his life, and he prefers routines and predictability. Minor is indecisive when faced with new situations. He is inclined to be deferential, ingratiating, and subordinate toward elders and authority figures. This inclination might manifest itself during positive situations involving his parents and teachers but also in antisocial situations when interacting with gang leaders. In contrast, minor acts in a "haughty and deprecatory manner" toward younger siblings and peers.

Dr. Nelson reported minor tends to have a serious mood, and he fears expressing his emotions and losing control. Minor's cooperative and controlled demeanor masks feelings of inadequacy and insecurity, and his desire to avoid disapproval might explain the great efforts he made to hide his illegal activities from his parents. He harbors an internal conflict between being compliant and meeting expectations on one hand, and a desire for independence and autonomy on the other. Minor became defensive when asked to self-reflect and downplayed his problems, so the personality test might not fully reflect the breadth of his difficulties.

The second personality test performed by Dr. Nelson, the Personality Assessment Inventory-Adolescent (PAI-A), showed minor might have difficulty expressing anger but he is generally a confident, resilient, and optimistic person. Minor's "interpersonal style" as reflected in the results showed him to be "friendly and extroverted" in social situations.

The State-Trait Anger Expression Inventory-2: Child and Adolescent (STAXI-2 C/A) reflected a normal range, meaning minor reported little to no feelings of anger. However, Dr. Nelson noted minor might have underreported his anger. Minor also tested in the low range for experiencing anger after provocation, which suggested he tended to suppress his anger. Dr. Nelson reported these results were consistent with minor's scores on the other tests because individuals who are deferential and ingratiating, and who attempt to follow the rules, are less likely to express anger for fear of being perceived as rude and disrupting relationships.

Dr. Nelson reported minor met the criteria in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) for adjustment disorder with depression, caused by the criminal charges he faced and potential transfer to adult criminal court. She reported minor was probably confused about his current life circumstances and the fact he had disappointed his family. Minor met the criteria for substance abuse disorders. Finally, minor met the criteria for conduct disorder because of his history of truancy, past robberies, and other incidents of major and minor violence. Dr. Nelson opined minor's most severe behaviors were "largely influenced by his gang

9

involvement," and "it appears that many of his reckless and dangerous behaviors occurred while under the influence of drugs and directly related to gang culture." She noted minor's substance abuse had a "disinhibiting effect" that led minor to engage in "more reckless" behavior and to exercise poor judgment.

In conclusion, Dr. Nelson opined minor could be successfully rehabilitated in the juvenile court system. The results of the diagnostic tests suggested minor's negative behaviors were not part of his nature, meaning he had room for growth and improvement. Dr. Nelson found minor displays no overt signs of mental illness, he is aware of his substance abuse problems, he appears motivated for treatment, and he possesses a positive attitude toward personal change. She reported minor would be more inclined to follow expectations if he were provided with proper guidance. Dr. Nelson reported minor's "prognosis for being rehabilitated under the juvenile court jurisdiction increases the more successfully disengaged he becomes from the negative influences of gang culture." She recommended a treatment plan that includes substance abuse recovery for more than six months, a plan to sever his ties with the gang, individual therapy, and job skills training.

Dr. Gimel Rogers, an expert retained by minor's counsel, also evaluated minor and administered 11 instruments and questionnaires to inform her opinion. In addition, Dr. Rogers interviewed appellant's father. Dr. Rogers reported she observed four visible tattoos on minor, including "T 17," his initials, and a cross on his right hand.

10

Dr. Rogers reported similar findings as Dr. Nelson with respect to minor's family history and background, his schooling, medical history, and substance abuse. Minor said his mother's boyfriends were involved in gangs and often acted violently toward him and his mother. Despite the drug abuse and violence in the home, minor looked up to his mother's boyfriends. Minor's father described various interventions in the home by child protective services.

Dr. Rogers reported the family was "devastated" by minor's arrest, because they believe he is a "good child with good behavior" and they hope he will be given another chance to succeed. Minor's father did not report knowing about minor's gang affiliation, and the father said minor follows the rules in his home. Minor said he had been reading the Bible while in jail and he believes in Jesus, and he told Dr. Rogers he had been spending his time "reading books, working out, and practicing his faith." He had a girlfriend and had maintained contact with her.

Minor described his record of physical altercations at school but claimed not to be the primary aggressor and to have been bullied because of his weight. Minor said he committed robberies to obtain illegal drugs for his personal use.

Minor's father denied that minor had a history of mental illness but also said minor had told relatives he wanted to kill himself. Minor reported no suicidal feelings. Minor told Dr. Rogers he had received a few months of individual counseling through a program called La Palabra (the word) and he received additional services through the Latino Commission.

11

Dr. Rogers reported minor's "primary diagnostic impression" was posttraumatic stress disorder-like symptoms. The various types of trauma minor had suffered in his mother's home left lasting impacts. Those traumatic events "collectively led to emotional difficulties such as markedly diminished interest or participation in usual and significant activities, painful emotional states, significant alterations in arousal and reactivity such as hypervigilance, and increased substance use."

Dr. Rogers found minor had average to below average verbal and nonverbal intelligence, he tends to be interpersonally passive and submissive, and he is indecisive about expressing autonomy or acquiescing in other's expectations and demands. Minor is also likely to seek approval and reassurance from others. His responses during testing "reflect a low level of anger and aggression and demonstrate an ability to regulate his emotions by means of self-constraint," and they reflect "above average psychological strengths including interpersonal skills and empathy." Minor expressed shame and remorse and acknowledged the impact of the killings on his family and community, which is uncharacteristic for psychopathic people.

Dr. Rogers opined minor was not criminally sophisticated. The trauma minor experienced during childhood made him more susceptible to risky behavior and mental illness. Trauma also impacted minor's view of himself. Dr. Rogers noted that for most youth, the period of risky experimentation does not extend beyond adolescence. Minor said he wanted to continue his education and find gainful employment.

12

In summary, Dr. Rogers found minor suffered substantial childhood trauma that impacted his physical and mental development. She reported (inaccurately) that minor's arrest for the murders was his first interaction with the legal system, and she believed he acted in response to outside influences. Therefore, Dr. Rogers opined minor could be successfully rehabilitated in the juvenile court system "because he demonstrates remorse and responsibility for his actions, has previously shown an ability to effectively engage in services, has established prosocial long-term goals, and has a strong support system." In contrast, Dr. Rogers opined that keeping minor in the adult criminal system could disrupt his personal development and make him more likely to commit crimes in the future. In addition, Dr. Rogers noted minor was more likely to be victimized in the adult criminal system and to maintain ties to maladaptive peers. She recommended minor be treated under the juvenile court system and rehabilitated with services providing "appropriate programming."

C. *Probation Officer's Report.*

Probation Officer Gutierrez evaluated and assessed minor pursuant to section 707, subdivision (a)(3), and recommended the juvenile court grant the transfer motion. In contrast to his statements to Dr. Nelson, during his interview with the probation officer minor denied he was a member of a gang but admitted he had friends who associated with gang members.

Minor's school records showed multiple referrals since 2016 for defiance, class disruption, fighting, causing physical injury, possessing a knife, damaging school

property, ditching class, and being under the influence. Minor received counseling, after school detention, and suspension. Minor denied having any mental health issues but told the probation officer he had been referred to the Latino Commission while in middle school for anger issues. He received three months of treatment through the Latino Commission and two years of treatment for anger and behavioral issues.

When interviewed, minor's father and stepmother said minor had a "rough upbringing." They received custody of minor when he was about 10 years old. Minor's mother was a drug user and her boyfriends abused her, often in minor's presence. The probation officer noted nine dependency referrals for neglect or abuse while minor lived with his mother, two of which were substantiated. Minor reported he had a good relationship with his father and stepmother, and said about his father, "'I can talk to him. We are good friends.'" He said his stepmother "'was always good to me.'" Minor's parents were shocked and depressed by the murder allegations. They asked that minor remain in the juvenile court system so he could be rehabilitated. Minor told the probation officer he was willing to comply with court orders, he hoped his case will stay in juvenile court, and he was "sorry about the charge." Minor said he was under the influence of drugs and didn't mean for the killings to happen.

The probation officer noted the availability of two rehabilitation programs, the Youth Treatment and Education Center (YTEC) and Pathways to Success (PTS) and described their services in detail.

14

The probation officer provided an evaluation and assessment of the five factors listed in section 707, subdivision (a)(3).

First, with respect to the degree of criminal sophistication, minor had been charged with two counts of first degree special circumstance murder. Minor was four months shy of his 18th birthday at the time of the offenses, which involved him luring two victims to an armed robbery. He knew the male victim was a rival gang member who sold drugs, and minor lured the victims by creating a fake Instagram account. Minor admitted he took marijuana from the victims' car after he had shot the victims and they lay dead or dying. Minor seemed "determined to accomplish his robbery plans" and, therefore, rather than let the victims flee when they resisted the attempted robbery, he shot them then took items from their vehicle.

As he did during his interview with Dr. Rogers, minor denied being a gang member. The probation officer concluded it was unclear whether minor would choose to leave gang life. The probation officer found "no indication the [minor] was peer pressured or induced to commit the offense." Although minor had a history of childhood trauma, there was no evidence of familial turmoil in minor's life at the time of the shootings and he enjoyed a "good family foundation" in his father's home. The probation officer concluded the criminal sophistication factor weighed in favor of transferring minor to adult criminal court.

Second, the probation officer evaluated whether minor could be rehabilitated before the expiration of the juvenile court's jurisdiction. Minor, who was 19 years old at

15

the time of the report, was eligible for commitment to PTS, and that program could offer "evidence-based programming, mental health treatment, education services, individual and group therapy, and vocational training." However, because the juvenile court's jurisdiction over minor would expire when reached the age of 25 (§ 707, subd. (b)), he would receive less than six years of treatment.

Addressing Dr. Nelson's prognosis that minor's chances for rehabilitation would increase the more he successfully disengaged from gang culture, the probation officer opined minor had no intention of leaving the gang and, to the contrary, he seemed to further embrace the lifestyle since his arrest. For example, minor had acquired at least three new tattoos since being in jail, including a teardrop that is known in gang culture to represent or commemorate the commission of a murder. In addition, the probation officer reported that, several months after the shootings, minor was arrested for possessing a knife at the Riverside Date Festival. The probation officer opined that six years of treatment through the juvenile court system "does not appear remotely adequate," and the second factor weighed in favor of the transfer to adult criminal court.

Third, the probation officer opined minor's previous delinquent history supported a transfer to adult criminal court. Minor had a history of truancy and drug use, and there were "four incidents of major and minor physical violence toward others in school between 2010 and 2021." During the 2021 incident—for which minor admitted he committed assault with force likely to cause great bodily injury—minor fought another student in the bathroom. The other student tried to prevent the fight, but minor physically

16

attacked him with such force that the victim lost three teeth and suffered a facial fracture. Before that, the school had already enrolled minor in anger management courses through the Latino Commission and minor had received two years of counseling. Moreover, outside of school, minor began robbing rival gang members when he was 12 or 13 years old, sometimes armed with a handgun, and he also sold drugs.

Fourth, with respect to whether prior attempts to rehabilitate minor had been successful, the probation officer reported the juvenile court had intervened once in 2021 after minor admitted to assaulting another student. During the three months minor was on active supervision, he tested positive for marijuana, he failed to complete his community service or the assigned one-page essay, he did not attend school, and he did not participate in court-ordered anger management or victim awareness classes. And, three months after being placed on probation, minor was arrested at the Riverside County Date Festival.

Last, with respect to the circumstances and gravity of the alleged offenses, the probation officer reported the circumstances were "extremely serious" and the killings had "shocked the conscience of the entire community." Minor planned the robbery of a rival gang member, lured the victims using a fake social media account, armed himself with a loaded firearm, and, when the victims resisted the attempted robbery, he fired multiple rounds at the fleeing vehicle in a residential neighborhood with no regard for the risks to bystanders from a stray bullet.

The probation officer concluded none of the factors suggested it would be appropriate to treat minor in the juvenile court system. She expressly disagreed with Dr. Nelson's and Dr. Rogers' opinions that minor had the ability to change. Instead, the probation officer opined the nature of the underlying offenses, minor's gang involvement, and his ability to elude apprehension for more than seven months demonstrated criminal sophistication. Moreover, the probation officer again reported finding "no indication [minor] is willing to exit the gang culture at this time." To the contrary, minor prided himself on targeting rival gang members. In the probation officer's opinion, minor's claim that the killings were merely the result of a drug deal gone bad was a "bold-faced lie." It was, according to the probation officer, better categorized as a "set-up robbery where no 'deal' was in his plans." Finally, although the probation officer acknowledged evidence that minor had suffered childhood trauma, since then he had lived in a stable home with his father and the trauma in no way justified his actions.

D. *Briefing And Hearing.*

The People's brief in support of the transfer motion addressed the five factors from section 707, subdivision (a), and argued minor (who was 19 years old at the time) was not a suitable candidate for treatment in the juvenile court system. In support of the brief, the People submitted various records and reports detailing the investigation into the current offenses, minor's gang ties, his school assault, his arrest for possessing a weapon, and jail records. The People noted minor had engaged in multiple acts of violence while in jail. On May 2, 2023, minor punched a fellow inmate and caused the inmate to lose

18

consciousness. On June 17, 2023, minor took part in a group fight with at least four other inmates. And, on November 20, 2023, minor fought with another inmate in what appeared to be mutual combat.

The People also discussed evidence of minor's gang involvement. Minor went by the moniker "Tiny" and posted photos of himself on social media making gang signs and holding firearms. Minor told investigators his "T 17" tattoo represented his gang moniker, "Tiny," and his age when he got the tattoo. The brief noted a gang expert had opined minor was an active member of the VCR 52 criminal street gang. In addition to his gang tattoos, minor used the letters "VCR" in his social media profiles, and he regularly posted photos of himself and his brothers making gang signs while holding firearms.

Counsel for minor filed a brief in opposition to the transfer motion, and argued the People had not met the burden of proving by clear and convincing evidence that minor was unfit for treatment as a juvenile. Counsel argued minor's actions did not demonstrate he was criminally sophisticated. Instead, focusing on evidence of childhood trauma, counsel argued "what could appear sophisticated really may be the result of poor choices and an inability to weigh consequences due to the underdeveloped pre-frontal cortex." Counsel also disagreed with the probation officer's opinion that minor was uninterested in separately himself from gang life and culture and noted minor had not been provided with rehabilitation services in the past. Moreover, minor's counsel questioned the probation officer's qualifications about child and human development.

19

With respect to minor's delinquent history, counsel noted minor had not received rehabilitative counseling after he was adjudged a ward of the juvenile court for the assault. In addition, counsel noted minor lacked positive role models in jail. Finally, to downplay the seriousness of the alleged offenses, counsel argued minor had "begged the victims not to leave because all he wanted was drugs," and the victims were "drug dealers selling to minors."

The parties stipulated at the hearing that minor was born November 26, 2004, meaning he was over 16 years old and otherwise eligible for transfer to adult court. (See § 707, subd. (a)(1).) The juvenile court stated on the record it had read and considered the first amended petition, the motion to transfer, the expert and probation department reports, and the parties' briefs and supporting exhibits. In addition, the court noted the People had the burden of proof.

A district attorney investigator testified the student victim of minor's school assault suffered long term effects, including a lack of confidence, disengagement from his friends, and weight loss. With respect to minor's arrest for possessing a dirk or dagger at the Riverside County Date Fair, a deputy sheriff testified deputies received reports of a fight and possible stabbing and of 10 to 12 males running to an exit. Video showed minor wearing a ski mask and waving a knife, apparently to scare people away from a fight between two groups of males. After the killings but before his arrest, minor pleaded guilty to possessing a dirk or dagger, admitted suffering prior convictions and that he was on probation at the time of the offense, and he was sentenced to two years in state prison.

A supervising probation officer testified new inmates in county jail are provided with a thick packet that includes information about how to access mental health services, schooling, and other services. Minor had not received any educational services at the jail. However, on cross-examination the probation officer acknowledged no one in adult jail guides inmates on how to access services. She testified that, as adults, "they can do what they want." Nonetheless, on redirect she testified inmates have incentives to participate in services, like earning money for commissary, obtaining occupational skills training certificates, and graduating from high school.

A sheriff's investigator testified to the facts underlying offenses. Minor and his cousin arrived at the scene of the planned robbery about 20 minutes before the victims and walked around. Video taken at the scene suggested the two positioned themselves so they could approach the victims from behind.

The investigator testified undercover officers inside the jail approached minor as part of a "Perkins operation"[2] to get him to talk about the shooting and make incriminating statements. Minor identified himself by his gang moniker, Tiny, and said he was from the Avenue 52 street gang. When asked by an undercover officer posing as an inmate about documents that had been left in a holding cell by an investigator, minor said they were about "the people he got," "the people I murdered." Minor said he was in custody for getting into a fight with a rival gang at the Riverside County Date Festival and possessing a knife and screwdriver. He talked about selling marijuana, using the

_____

[2] In a "*Perkins* operation," a suspect is placed in a cell with an undercover agent and their conversation is audio recorded. (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

21

money he earned from selling drugs to buy more drugs and guns, and about how he used a fake Instagram account to "set up" a rival gang member and rob him of his marijuana vape products. Minor said he got rid of his handgun after the shooting. Although minor also said the shooting was the result of a "drug deal gone wrong," he told the undercover officer he had gotten the cross tattoo on his face after the killings. The investigator interpreted minor's statement to mean the tattoo "may have been as a way to memorialize the murder."

Later, minor admitted to the investigator he had shot the victims but claimed to have acted in self-defense. At first, minor claimed the male victim had fired at him. But when challenged, minor admitted he had lied about the victim firing at him first and said, "he believed the male victim pointed a gun at him so that is why he began shooting." A search of minor's cellphone revealed photographs of guns, graffiti, and gang signs dating back to January 2022.

A gang expert opined minor was an active member of the gang at the time of the offenses and at present. Besides the cross tattoo on his face that was visible during the "Perkins operation," minor had since gotten more face tattoos, including a teardrop on his lower lip and the word "Jasmine" above his eye. In addition, the People admitted a photograph of minor taken during booking that showed he had a tattoo of "VCR" across his stomach.

The probation officer testified she did not believe minor would benefit from PTS or YTEC because those juvenile rehabilitation programs were too short in duration to

address minor's serious issues. She did not believe minor could be rehabilitated in the juvenile court system "based on all the negative documented behaviors, that the youth was bold, due to the severity of the offense." While acknowledging PTS and YTEC provided individual therapy, substance abuse treatment, job skills and other services that could help minor, the probation officer opined that, considering the "totality of the factors" under section 707, transferring minor to adult criminal court would be appropriate. Moreover, although minor seemed to understand he had issues that needed to be addressed, the probation officer testified she found no evidence minor was willing to address those issues or to leave the gang. For example, the fact minor got a large tattoo of "VCR" while in jail showed he had not disengaged from gang culture.

Dr. Rogers testified a healthy brain does not fully develop until age 25. When a person suffers trauma, the temporal lobe is often dormant, meaning it is unable to activate impulse control. Therefore, the person will tend to be highly reactive and impulsive. She testified her evaluation of minor mirrored Dr. Nelson's conclusions, and Dr. Rogers opined minor would benefit from rehabilitation as a juvenile. Dr. Rogers testified her opinion was informed by the records she had reviewed and minor's self-reporting during interviews. The juvenile court system has more services tailored to youth, whereas the adult jail environment "reaps violence" and minor would be more likely to reoffend if kept in that environment without rehabilitative services.

On cross-examination, Dr. Rogers acknowledged her opinion was only as good as the information that informed it. Dr. Rogers testified she had not personally spoken to

23

anyone at the PTS or YTEC, and she had never worked in the Riverside County jail or juvenile hall. Moreover, she acknowledged minor's previous robberies, in which he targeted rival gang members, were premeditated and criminally sophisticated. Dr. Rogers testified minor was not forthcoming during their interview when he said he had not been involved in any altercations while in jail. She did not learn about minor's jail incidents until after she had completed and submitted her report. Although minor never said he felt remorse for the killings, Dr. Rogers testified she observed remorsefulness from minor's body language. Finally, Dr. Rogers acknowledged successful therapy requires a patient to be vulnerable, which could be problematic in minor's case.

The People argued minor killed two people over "drugs and revenge." He had been on a "path of destruction" for a long time. For instance, minor had pledged his allegiance to a gang, had unlawfully possessed firearms, had posted photographs of himself participating in gang activity and with guns, and he was influential in his gang. Despite having a loving and stable homelife since age 10, minor had constantly engaged in criminal behavior. Attempts at rehabilitation had failed and the gravity of his current offenses was "unmatched, immeasurable." Minor targeted a rival gang member, used a fake social media account to lure the victims to the scene, and arrived earlier and placed himself in a position of tactical advantage to rob the victims by force.

Counsel for minor argued minor made bad decisions because of his drug use, and his childhood trauma prevented him from foreseeing the consequences of his actions. Minor's actions should not be considered the results of choices he made, but rather as

24

symptoms of his problems. Counsel argued the juvenile court was required to consider minor's traumatic history when applying the factors under section 707. She argued both PTS and YTEC have programs to address gang rehabilitation, which supported denying the transfer motion. Counsel also argued everyone will benefit if minor is successfully rehabilitated, including the community and his family.

E. *Juvenile Court's Order.*

In its written order granting the transfer motion, the juvenile court evaluated the five factors found in section 707 and noted the People bore the burden of proving by clear and convincing evidence that minor was not amenable to treatment as a juvenile. After summarizing the totality of the evidence the court had considered, the court made findings for each of the five criteria.

For the first factor, the juvenile court found minor demonstrated a "high level of criminal sophistication." The court found minor "carefully planned the robbery … by taking steps to create a fake Instagram account," "selected the location" for the drug purchase, brought a loaded firearm with him, "and arrived early to observe or watch the victims' vehicle on scene." In other words, the attempted robbery and shooting "was not a purely spontaneous event," but a "specifically planned" crime "with a pre-set location." The court noted it appeared minor "took the victims by surprise in this case, taking advantage of their vulnerability and it showed a high degree of callousness when he entered their vehicle after the shooting and took keys and marijuana, when they were already grievously injured and dying." Moreover, the court observed that selecting a

drug dealer as the victim "demonstrates criminal sophistication . . . because [minor] may assume that a person selling drugs may be less likely to report that crime." And, although minor told Dr. Nelson he was under the influence at the time, the court noted he "had the presence of mind to carefully take steps to plan and execute the robbery" and to discard evidence immediately after. Indeed, Dr. Rogers had noted minor was able to exercise appropriate judgment, and Dr. Nelson reported minor understood the wrongfulness of past actions. Finally, the court observed minor's flight from the scene, disposal of evidence, and the efforts he took to avoid detection for several months demonstrated "an understanding and appreciation of the wrongfulness of his conduct."

The juvenile court expressly acknowledged evidence that minor had suffered childhood trauma and noted the experts diagnosed minor with PTSD-like symptoms, adjustment disorder, other specified trauma-and-stressor related disorder, and substance abuse disorder. The court stated it "d[id] not minimize the trauma" minor had suffered and acknowledged everyone processes trauma differently. However, reviewing the whole record, the juvenile court found minor was criminally sophisticated. The court found minor is "clearly entrenched in the VCR gang, has been for a number of years, . . . is refusing to denounce his allegiance and loyalty to the gang, and [is] still receiving gang-oriented tattoos recently while in jail."

Looking to the second factor, the juvenile court found the People had not proven by clear and convincing evidence that minor could not be rehabilitated before the expiration of the juvenile court's jurisdiction, and the factor did not support a transfer to

adult criminal court. The court noted minor would be eligible for treatment under the juvenile court system until he turned 25 years old, the PTS program and YTEC would offer a variety of programming to assist in minor's rehabilitation, and the record contained some evidence to suggest minor was remorseful. However, the juvenile court noted the discrepancies between minor's statements during his evaluations and his actions. Minor told Dr. Rogers he had not been involved in any altercations while in jail, but the evidence presented at the hearing showed he was involved in three documented incidents of violence during that time. Likewise, the probation officer had opined successful rehabilitation would require minor to remove himself entirely from gang culture, but minor's conduct—including getting new gang tattoos and his arrest for possessing a weapon—seemed to show he was uninterested in doing so. Nonetheless, the juvenile court was unable to find the second factor supported transfer to adult criminal court.

The juvenile court found the third factor, minor's prior delinquent behavior, supported a transfer to adult criminal court. Minor's delinquent history began in school and included a wide array of deviance. He admitted he started carrying a knife and gun while in middle school and this behavior coincided with his joining a gang. Minor also admitted he posted on social media pictures of himself holding guns, and that he began stealing from rival gang members when he was only 12 or 13 years old. His delinquent behavior escalated in seriousness, including severely beating a fellow student. Even after he admitted to the assault and was placed on probation—a few months after the shooting

27

but while still he remained at large—minor (who was then 18 years old) participated in a group fight at the Riverside County Date Fair and was arrested possessing a dirk or dagger, for which he was sentenced to state prison for two years.

The juvenile court stated it had considered the effect of minor's childhood trauma but noted his delinquent behavior escalated even after he had been placed with his father and stepmother in about sixth grade. The father's home was a "loving and stable environment" in a safe neighborhood where minor was enrolled in counseling for over two years. Yet, minor's behavior worsened, and he continued to immerse himself in gang life despite having a positive role model in his father and despite having no gang influences in his family.

For the fourth factor, the juvenile court found the People had failed to prove by clear and convincing evidence that minor's lack of success in previous attempts at juvenile rehabilitation supported a transfer to adult criminal court. During the three months he was on probation for the assault, minor tested positive for marijuana, failed to complete his community service requirement, did not write a court ordered essay, and did not attend anger management or victim awareness courses. And he reoffended during that time and was arrested as an adult and charged with possessing a dirk or dagger. However, during that three-month period the probation department had not had the opportunity to provide minor with rehabilitative services.

As for the fifth factor, the juvenile court found the circumstances and gravity of minor's alleged offenses amply supported a transfer to adult criminal court. It found the

28

alleged offenses were "very serious." The court adopted much of its analysis and reasoning with respect to the first factor, and reiterated minor's actions resulted in the shooting deaths of two minors as they tried to flee from the attempted armed robbery.

Although the juvenile court once more stated it had considered and did not diminish evidence of minor's childhood trauma and the suffering it caused him, the court found it did not mitigate the gravity of the offenses. Apparently responding to the arguments of minor's counsel, the court observed the fact the male victim was engaged in illegally selling drugs to minors "in no way justified Minor's actions of setting him up to rob him and to shoot him, and to riddle him with gunfire as he and [the female victim] tried to drive away." The court also found minor was the "primary aggressor" and there was no evidence to suggest he acted out of fear when he chased and fired at the fleeing vehicle. Weighing the mandatory factors and considering evidence of minor's childhood trauma, the juvenile court found minor "clearly understood the wrongfulness of his actions." After firing 15 bullets at the fleeing vehicle, minor stole items from the vehicle "as the victims were grievously wounded and near death," then fled the scene on foot. The court found minor's actions were "particularly callous and aggravating as opposed to mitigating in any way." Moreover, the court found minor's disposal of evidence after the shooting and the steps he took to avoid detection further highlighted his understanding and appreciation for the wrongfulness of his actions. Finally, the court noted minor got a cross tattoo on his face to memorialize the murders. Therefore, considering the totality of the evidence, the court found the People had met their burden on the fifth factor.

29

Before addressing the "ultimate decision" required by recent amendments to section 707—whether minor was amenable to rehabilitation in the juvenile court system—the juvenile court acknowledged "recent changes in the law clearly indicate a legislative preference for keeping more juvenile offenders within the juvenile justice system." The court also noted the People's burden of proof on a motion to transfer had been raised to clear and convincing evidence. With respect to its own duties under the amended law, the court observed "the ultimate decision on whether to grant the [People's] transfer motion [was] not a simple balancing or counting of the various criteria and cannot be based on the seriousness of the offense alone."

The juvenile court stated it had evaluated all statutory criteria, considered the totality of the circumstances, and agreed with the probation officer's opinion and recommendation that minor was not amenable to treatment as a juvenile. Although the probation officer (and the People) had urged the juvenile court to find all five factors supported a transfer to adult criminal court, the court reiterated it could not find by clear and convincing evidence that factors two and four supported the motion. Ultimately, however, the court found clear and convincing evidence supported its findings on the remaining three factors, and the "significant weight" the court gave to those factors informed and supported the ultimate determination that minor was not amenable to juvenile court rehabilitation.

In addition, the juvenile court observed minor's "actions in the Riverside County jail, his lack of truthfulness regarding his gang involvement with the Probation Officer

30

and the psychologists, his past and continued gang activity and demonstrated entrenchment in his gang, including, but not limited to, continuing to obtain gang-related tattoos while in county jail, and his failure to denounce and disengage from his gang, demonstrate an affirmative impediment to his growth, maturity and ability to rehabilitate within the juvenile court's jurisdiction." The court expressed its "serious concerns" that minor's inability to willingly, openly, and honestly engage in treatment constituted "impediments or barriers to treatment." Minor had been provided two years and three months of treatment in the community while living in a stable and loving home with a positive role model, yet he had not engaged with his treatment.

Therefore, the juvenile court found the People had met their burden of proof and demonstrated minor was not amenable to rehabilitation within the juvenile system, and the court granted the transfer motion.

## II.

## DISCUSSION

We conclude the record contains substantial evidence to support the juvenile court's findings in support of the order transferring minor to adult criminal court, and affirm the order grating the motion.[3]

---

[3] As noted, *ante*, the juvenile court found the People had not proven by clear and convincing evidence that factors two and four supported a transfer. The People do not challenge those findings on appeal or argue substantial evidence would have supported favorable findings on those factors, and we do not address them.

31

A. *Applicable Law*.

The point of the hearing on a transfer motion is not to determine whether the minor committed the alleged offense or offenses, but solely to decide whether the minor will be a suitable candidate for treatment as a juvenile if the allegations are later proven true. (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).) "[T]he criteria used to determine fitness" for treatment as a juvenile "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 682 (*Jones*).)

This court recently canvassed the law applicable to transfer motions under section 707, including recent amendments that modified the standard of proof and added criteria the juvenile court must consider. "Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' [Citation.] The prosecution bears the burden of proving that the minor should be transferred." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of

criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*'" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"The five statutory criteria listed in subparagraphs (A) through (E) of section 707[, subdivision] (a)(3) were not amended by Assembly Bill [No.] 2361. Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' [citation], (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation],[4] (3) '[t]he minor's previous delinquent history' [citation], (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' [citation], and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' [citation]. The statute sets forth a nonexhaustive list

---

**4** "[T]he second criterion–'[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation] is distinct from the ultimate determination 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court'." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.)

of relevant factors for the court to consider with respect to each of the five criteria."
(*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"Effective January 1, 2024, Senate Bill [No.] 545 amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. [Citation.] The previous version of the statute made consideration of those factors discretionary, not mandatory. [Citation.] With respect to the degree of criminal sophistication, Senate Bill [No.] 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.'" (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.) "[T]he express terms of section 707[, subdivision] (a)(3) require the court to evaluate [all] five criteria in determining whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' and that the statute does not require that any of those criteria be afforded any greater weight than any other." (*Miguel R.*, at p. 167.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section

707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

B. *Degree of Criminal Sophistication.*

With respect to the first factor (§ 707, subd. (a)(3)(A)(i)), the juvenile court must "consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*Jones*, *supra*, 18 Cal.4th at pp. 683-684.) Evidence of criminal sophistication includes detailed planning and execution of the alleged offense; the fact the minor obtained a firearm, gloves, and a mask beforehand; the selection of a specific victim because the minor believed he or she would not be apprehended; and disposal of evidence that might link the minor to the offense. (*Id.* at p. 684.) And, as noted, under a recent amendment the court must give weight to "any relevant factor," including a non-exhaustive list of circumstances such as childhood trauma that might bear on the minor's

35

criminal sophistication.  (§ 707, subd. (a)(3)(A)(ii); see *Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

Here, the juvenile court found the circumstances of the offenses demonstrated, by clear and convincing evidence, minor had a "high level of criminal sophistication."  We agree.  As the juvenile court found, the attempted robbery and killings were carefully planned and not spontaneous, which support a finding of deliberation and criminal sophistication.  (*Jones*, *supra*, 18 Cal.4th at p. 684 ["The minors planned the offense in considerable detail."]; *In re J.S.* (2024) 105 Cal.App.5th 205, 214 ["The crimes were not spontaneous or impulsive but were indicative of deliberation."].)

The evidence showed minor set up a fake Instagram account to lure the victims to a purported drug purchase, with the intent of robbing them.  He directed the victims to his chosen location for the robbery and armed himself with a loaded handgun.  Moreover, the evidence showed that minor arrived at the scene about 20 minutes before the victims, walked around the area a bit, and positioned himself so he could approach the vehicle from behind—where he had the tactical advantage and was able to take the victims by surprise.  The fact minor purposely placed the victims in a vulnerable position supports a finding of criminal sophistication.  (See *In re J.S.*, *supra*, 105 Cal.App.5th at p. 214 ["The victims were vulnerable"].)

As the juvenile court also found, minor's selection of the victims—drug dealers who are not likely to report a robbery—demonstrates a high level of criminal sophistication.  (*Jones*, *supra*, 18 Cal.4th at p. 684 [Minors "selected as their target a

36

neighborhood store, because they believed they could 'get away with it.'"]; cf. *In re Harper* (2022) 76 Cal.App.5th 450, 462, fn. 6 ["[A] defendant might steal from a drug dealer, an undocumented immigrant, or even a family member and reasonably assume the victim will be reluctant to report the crime to the police."].)  In addition, minor's disposal of his handgun and other evidence after the shooting, the steps he took to avoid capture, and the fact the offenses were gang related support the juvenile court's finding of criminal sophistication.  (*Jones*, at p. 684 ["[T]o avoid detection, [minors] disposed of evidence linking them to the offense."]; *Kevin P.*, *supra*, 57 Cal.App.5th at p. 193 ["attempts to cover up . . . involvement in the crime" supported finding of criminal sophistication].)

Although he acknowledges the juvenile court expressly addressed and considered evidence of childhood trauma when it found he had demonstrated criminal sophistication, minor claims the court did not give sufficient weight to that evidence and, therefore, he argues the court's finding on that factor is not supported by substantial evidence.  Minor essentially ignores the appropriate standard of review.  "[T]he existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence.  In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them.  [Citation.]  We consequently are concerned only with whether ""the circumstances reasonably justify the trier of fact's findings.""  [Citation.]  When evidence reasonably justifies the trier of fact's findings, "'the opinion of the reviewing court that the circumstances might also reasonably be

37

reconciled with a contrary finding does not warrant a reversal of the judgment.""'"
(*Miguel R.*, *supra*, 100 Cal.App.5th at p. 169.)

The minor in *In re J.S.*, *supra*, 105 Cal.App.5th 205 made a similarly unavailing argument, asserting the juvenile court ignored "'significant evidence'" he had submitted that bore on the mitigating factors set forth in section 707, subdivision (a)(3)(A)(ii), "including evidence of childhood trauma and favorable evidence of his therapeutic growth while in custody." (*In re J.S.*, at p. 214.) The appellate court was unpersuaded. "[T]he juvenile court expressly stated in its written ruling that it had considered 'the arguments of counsel, the reports and exhibits admitted into evidence, and the testimony of all witnesses,' which necessarily included evidence of appellant's social, emotional, and intellectual history." (*Ibid.*) Only after considering *all* the evidence did the court make its finding of criminal sophistication. (*Ibid.*) Here, the juvenile court expressly acknowledged evidence of minor's childhood trauma, and the court was careful to note it did not mean to diminish minor's suffering. On this record, we simply cannot find the juvenile court failed to properly consider evidence of childhood trauma.

Finally, minor argues the juvenile court "ignored all the science surrounding children's brain development and their inability to make sophisticated choices." But, as the People counter, minor cites no authority for the proposition the juvenile court must *expressly* address such scientific evidence. In *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009 (*C.S.*), the minor argued the juvenile court failed to recognize "his 'adolescent brain and trauma history' made him less criminally sophisticated." (*Id.* at

38

p. 1030.)  The appellate court noted minor's claim of error presumed the juvenile court had, in fact, found the criminal sophistication factor weighed in favor of the transfer. Because the juvenile court "did not specify whether it found this criterion weighed in favor of transfer, against transfer, or was neutral," however, the appellate court was unable to decide "how this criterion weighed in the juvenile court's analysis of whether to transfer [the minor] to adult/criminal court."  (*Id*. at pp. 1030-1031, 1033.)  In contrast, minor's counsel here cited and discussed studies on juvenile brain development, and the juvenile court expressly stated it had read and considered the parties briefs and arguments before it found the factor of criminal sophistication weighed in favor of a transfer. Therefore, we must conclude the court properly considered that evidence when making its findings.  (See *In re J.S.*, *supra*, 105 Cal.App.5th at p. 214.)

C.  *Previous Delinquent History*.

The third factor, the minor's previous delinquent history (§ 707, subd. (a)(3)(C)(i)), requires the juvenile court to "give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior."  (*Id*., subd. (a)(3)(C)(ii).)  The juvenile court may properly consider the minor's subsequent conduct *after* the alleged offenses when determining whether prior delinquent history supports a transfer to adult criminal court, including conduct that did not result in the filing of a wardship petition or adult charges.  (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451-456.)

As the juvenile court observed, the record demonstrates minor's history started in elementary school and included acts of "defiance, disrespectful behavior, class disruption, fighting, causing physical injury, being in possession of a folding knife, truancy, tardiness, and being under the influence." The probation officer's report detailed this history, which minor admitted in large part. Minor admitted he started carrying a knife and gun while in middle school, around the time he joined a gang. He admitted to posting photographs of himself on social media holding guns. In addition, minor admitted that when he was 12 or 13 years old he started robbing rival gang members and often flashed a firearm to gain compliance. Minor was suspended from school during this time and received several referrals for counseling and anger management classes.

The court also considered the "escalation" in minor's delinquent conduct. The probation officer reported "four incidents of major and minor physical violence toward others in school between 2010 and 2021." Minor was expelled from school and admitted to committing a felony assault with force likely to cause serious bodily injury while fighting a fellow student in the school bathroom. The alleged killings took place one month after the fight. And, a few months later, after minor had turned 18 and while he was on probation for the assault, minor was arrested for possessing a concealed dirk or dagger after participating in a fight with rival gang members. Minor pleaded guilty to the adult weapons charge. Finally, the undisputed evidence admitted at the hearing demonstrated minor had been involved in multiple acts of violence while in jail.

In *In re J.S.*, *supra*, 105 Cal.App.5th 205, the appellate court found similar evidence supported a finding that previous delinquent history weighed in favor of a transfer to adult criminal court. "[T]he juvenile court recounted appellant's previous contact with law enforcement, including bringing a knife to school, trespassing, robbery, theft, and failing to fulfill the terms of his probation. The juvenile court also noted appellant's 'significant school delinquency' history starting in the seventh grade, including poor behavior, suspensions, and multiple attempts by school officials to rehabilitate appellant. This previous delinquent history supported transfer to adult court." (*Id.* at pp. 214-215.) So too here. Minor's delinquent history, both in and out of school, amply supports the juvenile court's finding on this factor.

Minor argues the juvenile court's findings are not supported by substantial evidence because the court "focused solely on [minor's] delinquent history" and ignored or "gave little consideration" to factors such as evidence of childhood trauma. We do not agree. As it did with respect to the first factor, the juvenile court expressly stated it had considered the effect of minor's childhood trauma, but found his delinquent behavior continued to escalate even after he was placed in his father's and stepmother's home in about sixth grade. After moving in with his father, minor had a "loving and stable environment" in a safe neighborhood where he was enrolled in counseling for more than two years. Yet, minor's behavior worsened, and he continued to immerse himself in gang life despite having a positive role model in his father and no gang influence in his family.

41

Minor discounts evidence he had a stable home since being placed with his father and argues his positive home life could not counterbalance the negative pull exerted by gang life. But, to repeat, this type of argument asks us to substitute our judgment for that of the juvenile court, something we cannot do. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 169.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640; see *In re J.S.*, *supra*, 105 Cal.App.5th at p. 208 ["The Court of Appeal does not reweigh evidence on appeal. The Court of Appeal does not substitute its discretion for that of the trial court on appeal."].)

D. *Circumstances and Gravity of the Offenses*.

When determining whether the circumstances and gravity of the offenses weigh in favor of a transfer to adult criminal court (§ 707, subd. (a)(3)(E)(i)), the juvenile court must give weight "to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (*Id.*, subd. (a)(3)(E)(ii).) In addition, the court must consider any evidence that might be offered to show the minor had been "trafficked, sexually abused, or sexually battered the minor." (*Id.*, subd. (a)(3)(E)(iii).) "[T]he allegation that

a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' [Citations.] Rather, in evaluating this criterion, a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude.'" (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 189.)

The juvenile court began its analysis of this factor by stating the alleged offenses—two counts of first degree special circumstance murder—are "very serious." The court adopted most of its factual analysis and reasoning from the first factor, and summarized the evidence that minor arrived early at the scene of the purported drug purchase, purposely positioned himself to surprise the victims from behind, and fired about 15 bullets at the victim's vehicle when they resisted the robbery and tried to drive away. The court specifically found minor "was a direct participant," "the actual shooter," and "the principal aggressor." The court also found the fact the victims were themselves involved in criminal activity "in no way justified" minor's actions, and the court expressly dismissed the suggestion minor might have acted out of fear because the evidence showed he ran after the fleeing vehicle while firing his handgun and yelling for the victims to stop.[5]

With respect to minor's actions immediately after the shooting, the juvenile court found that minor's act of entering the vehicle to steal marijuana and other items, as the victims "were grievously wounded and near death," demonstrated the offenses were

---

[5] Although the juvenile court indicated the record included no evidence of how the offenses had impacted the victims' families, the court reasonably surmised the killings had a "devasting impact" and the suffering would be "long-lasting, if not life-long, leaving each family with deep emotional scars."

"particularly callous and aggravating." The court also noted the fact minor discarded evidence as he fled the scene and took other steps to avoid detection demonstrated he understood and appreciated the wrongfulness of his conduct. Last, the court observed minor subsequently got a tattoo of a cross on his face, apparently to "memorialize" the killings.

As with the other factors, the juvenile court explicitly stated it had considered minor's childhood trauma, stated it did not diminish the suffering he endured from that trauma, and stated it had considered minor's claim to have been under the influence of Xanax and marijuana at the time of the shooting. Moreover, the court expressly stated it had considered how minor's "mental and emotional development" had been impacted by his childhood trauma. Nonetheless, the court found minor's actions showed he understood what he was doing was wrong and, "on balance," minor's childhood trauma, intoxication, and mental and emotional health and development did not mitigate the gravity of the offenses.

We find substantial evidence supports the juvenile court's finding. Unlike in *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706 (*J.N.*), where the appellate court found insufficient evidence of gravity because the killing "was not a sophisticated, planned murder," and the minor "was not the killer" (*id*. at pp. 723-724), the record here amply supports the juvenile court's findings that minor planned and executed a sophisticated armed robbery and was the principal aggressor and actual shooter/killer when the victims resisted the robbery and tried to flee. Therefore, this case is more like *C.S.*, *supra*, 29

Cal.App.5th 1009, where the appellate court found substantial evidence supported the juvenile court's findings because the juvenile in that case personally and actively participated in an unprovoked gang-related attack, kicked and punched the victim, and finally stomped on the victim's head and killed him even after the other attackers had fled. (*Id*. at pp. 1033-1034.)

Minor contends the circumstances and gravity of the offenses "is arguably the least important or helpful criterion" because he is presumed to have committed the offenses, and those criteria do not demonstrate he is not amenable to treatment as a juvenile. While stating he does not intend to minimize "the seriousness of the crimes before the court," minor argues the circumstances and gravity of the offenses do not, by themselves, establish he is not amendable to treatment.

We agree, as we must, that the circumstances and gravity of the offense is not a *sufficient* reason to find a minor is unfit for treatment as a juvenile. (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714 (*Jimmy H.*) [when deciding fitness, "the court must go beyond the circumstances surrounding the offense itself and the minor's possible denial of involvement in such offense."]; cf. *Kevin P.*, *supra*, 57 Cal.App.5th at p. 201 ["while the circumstances of an offense are key to evaluating section 707's gravity criterion, they cannot be the sole basis for concluding under the rehabilitation criterion that the minor is unlikely to be rehabilitated before juvenile jurisdiction expires."].) But, as we conclude, *post*, in conjunction with the remaining factors that bear on the ultimate

45

finding of amenability, the circumstances and gravity of the offenses *do* strongly support the juvenile court's order.

E.  *Amenability to Treatment as a Juvenile*.

As indicated, *ante*, a recent amendment to section 707 requires the court to make an "ultimate" finding that the minor is not amendable to treatment as a juvenile before it can transfer him to adult criminal court.  (§ 707, subd. (a)(3); see *Miguel R*., *supra*, 100 Cal.App.5th at pp. 164, 167.)  The court must consider all five enumerated factors and state its reasons for finding the minor to be unamenable to treatment in the juvenile court system.  (§ 707, subd. (a)(3); Cal. Rules of Court, rule 5.570(c).)

We find the juvenile court's determination that minor was not amendable to juvenile treatment is supported by substantial evidence.  To repeat, before addressing the ultimate question of amenability, the juvenile court expressly recognized the recent amendments to section 707 reflected a legislative preference for keeping more juvenile offenders within the juvenile court system, and one manifestation of that preference was the increased standard of proof on the People.  The court noted it based its determination of amenability on its evaluation of the five statutory factors and of "the totality of the circumstances."  Moreover, the court expressly recognized it could not simply balance or count the various criteria, and it could not base its decision about amenability solely on the seriousness of the offenses.[6]

---

[6] *In re S.S.* (2023) 89 Cal.App.5th 1277, on which minor relies, is easily distinguishable.  The juvenile court in that case granted a transfer motion *before* section 707 was amended to require an ultimate finding of amenability for juvenile court

*[footnote continued on next page]*

After considering the statutory factors "and all the evidence presented," the juvenile court agreed with the probation officer that minor was not amenable to treatment as a juvenile. The court found clear and convincing evidence supported its findings that three statutory factors weighed in favor of transfer, and the "significant weight" the court gave to those factors informed and supported its ultimate determination that minor was not amenable to treatment as a juvenile. The court specifically noted that minor's actions since being in jail, his lack of truthfulness when interviewed during the evaluation process, and his past and current behavior indicative of entrenchment in gang culture, all "demonstrate an impediment to his growth, maturity and ability to rehabilitate within the juvenile court's jurisdiction." The court was seriously concerned minor's inability to willingly, openly, and honestly engage in treatment constituted "impediments or barriers to treatment." For example, minor had been provided two years and three months of treatment in the community while living in a stable and loving home, yet he had not engaged with his treatment. Therefore, the juvenile court found the People had met their burden of proof and demonstrated minor was not amenable to rehabilitation within the juvenile system.

Minor argues the juvenile court erred by ignoring and rejecting the expert opinions of Dr. Nelson and Dr. Rogers that he was amenable to treatment as a juvenile. Once more, we are unpersuaded.

---

treatment. The appellate court ruled the amendment was retroactive and ordered that on remand the juvenile court conduct a new hearing and focus on the question of amenability. (*S.S.*, at pp. 1288-1289, 1293-1294.)

As with the second factor—whether the minor can be rehabilitated before the juvenile court loses jurisdiction—the parties may introduce expert testimony on the ultimate issue of amenability, specifically addressing "the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs." (*J.N.*, *supra*, 23 Cal.App.5th at p. 721.) Expert witnesses can provide "guidance" for the juvenile court in making its determination, and expert opinion testimony "that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination." (*Jimmy H.*, *supra*, 3 Cal.3d at pp. 714-715.) However, the "decision rests in the sound discretion of the juvenile court," and an expert opinion that a minor is amenable to treatment "is not conclusive." (*Id.* at p. 715; see *In re J.S.*, *supra*, 105 Cal.App.5th at p. 212 [juvenile court was not bound by defense expert's testimony and opinion].)

The juvenile court expressly stated it had considered "all the evidence presented" and had given weight to all factors, which necessarily includes the expert opinions that minor was amenable to juvenile treatment. However, as the People argue, the court implicitly recognized the limited value of those expert opinions when it found minor's actions, lack of truthfulness, and failure to engage in previous attempts at rehabilitation demonstrated "affirmative impediment[s]" to his growth and ability to be rehabilitated as a juvenile. In her report, Dr. Nelson noted that successful rehabilitation depended in large part on minor disengaging from his gang, but it was unclear whether minor would do so. As the court found, the evidence strongly showed minor had no intention to

disengage with the gang and had instead further embraced the gang lifestyle while in jail. When they formed their opinions, neither expert was aware that minor had been engaged in multiple physical altercations in jail. And, contrary to the available evidence, minor told Dr. Nelson he was not the primary aggressor in previous violent incidents and his arrest for the current offenses was his first interaction with the legal system. "[T]he juvenile court was not required to credit the testimony of the defense experts. As trier of fact, it was free to discredit such testimony." (*In re J.S.*, *supra*, 105 Cal.App.5th at p. 212.)

Minor cites *J.N.*, *supra*, 23 Cal.App.5th 706 for the proposition that the People failed to meet their burden of presenting evidence about available juvenile treatment programs and of proving minor was not amenable to treatment under those programs. *J.N.* is distinguishable. The probation officer there prepared a report describing the types of treatment the juvenile would potentially receive in the Department of Juvenile Justice. (*Id*. at p. 721.) "Then, without any analysis, the report concludes: 'Therefore, under this criterion, the minor appears to be unsuitable to be dealt with under the Juvenile Court law.'" (*Ibid*.) In holding the prosecution had failed to establish the juvenile was unsuitable for treatment in juvenile court, the appellate court concluded the probation officer's opinion "was not substantial evidence because the opinion lacked support by substantial evidence." (*Id*. at p. 722.) "[T]he prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's

49

jurisdiction. There was no evidence that demonstrated existing programs were unlikely to result in J.N.'s rehabilitation, why they were unlikely to work in this case, or that they would take more than three years to accomplish the task of rehabilitating J.N." (*Ibid.*) "There was no evidence as to the efforts necessary to rehabilitate J.N. and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted. This lack of evidence rendered any opinion based on the report without evidentiary value." (*Ibid.*)

In contrast, the juvenile court here had before it not only the probation officer's report and testimony, which described the available juvenile justice treatment programs, the court also had at its disposal the reports and opinions of Dr. Nelson and Dr. Rogers, who likewise addressed available programs and whether minor would be amenable to treatment. And, to repeat, the juvenile court expressly stated it had reviewed and considered all the evidence and arguments presented on the motion.

In sum, we conclude the record contains substantial evidence that minor was not amenable to treatment as a juvenile, and that the juvenile court did not abuse its discretion by granting the motion to transfer minor to adult criminal court.

III.

DISPOSITION

The order of the juvenile court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

FIELDS

J.


MENETREZ

J.